UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| ROQUE ALDANA | * | CIVIL ACTION |
| | * | |
| versus | * | No. 13-553 |
| | * | c/w 13-4917 |
| | * | |
| MAYBELLE SHIPPING, LLC, ET AL. | * | SECTION "L" (4) |

ORDER & REASONS

Before the Court is a Motion for Summary Judgment filed by Defendants.  (Rec. Doc. 35).  The Court has reviewed the briefs and the applicable law and now issues this Order and Reasons.

I.      BACKGROUND

This maritime personal injury case arises out of an injury that Plaintiff Roque Aldana allegedly sustained on or about January 1, 2013, while working as a harbor worker for Total Marine Services, Inc ("Total Marine").  (Rec. Doc. 1-2 at 1).  At the time of the accident, Aldana was performing repair work aboard the *M/V Sea Rambler*.  (Rec. Doc. 1-2 at 1).  The *Sea Rambler* is an aluminum-hulled offshore supply vessel, which is owned by Siewdath Sookram and operated by Defendant Maybelle Shipping, LLC ("Maybelle").  In May 2012, the *Sea Rambler* was driven under its own power and steering from Venice, Louisiana to the dock at American Tugs on the Harvey Canal.  While at American Tugs, the *Sea Rambler* underwent inspections by the U.S. Coast Guard.  In December 2012, the U.S. Coast Guard required the *Sea Rambler* to be taken out of the water so that previous repairs made to a "wear plate" on the stern hull could be inspected and potentially repaired.  Peter Browne, Maybelle's operations manager and captain of the *Sea Rambler*, made arrangements with Total Marine for the inspection and

repair of the stern hull.  Total Marine specializes in the repair of oil-field related vessels, and both parties agree that these repairs are typical of the type of repairs that Total Marine performs. In mid-December 2012, the *Sea Rambler* was driven under its own power and steering across the Harvey Canal to the Total Marine shipyard.

On December 28, 2012, the U.S. Coast Guard inspected the *Sea Rambler*, which was sitting on blocks in the Total Marine shipyard.  The Coast Guard wanted to ensure that the welding repairs had not compromised the water tight integrity of the *Sea Rambler*'s compartments.  To determine if a vessel's compartments are watertight, the hatch covers are tightened down and air pressure is introduced into the compartments affected by the repairs. Soapy water is placed on the welding repairs and if no bubbles form, then the repairs are determined to be watertight.  In order to turn a hatch cover, a t-wrench is inserted into a hexagon opening on the top of the screw.  When the screw is turned, it tightens a "strongback" mechanism, or bar, on the bottom of the hatch cover, which tightens the hatch cover to the lip of the manhole opening.  The Coast Guard was unable to determine if the air pressure test was accurate because the hatch covers were frozen and would not tighten.  The Coast Guard, therefore, advised that it would re-test the compartments when the hatch covers were more workable.

On December 31, 2012, after attempts to tighten the hatch covers were unsuccessful, Kirk Bergeron, Total Marine's general manager, directed the removal of all 8 hatch covers from the *Sea Rambler*'s deck.  Bergeron testified that the hatch covers were brought to the Total Marine tool room, where workers tried to "free up" the tightening screw, which was not turning properly. (Rec. Doc. 35-7 at 26-27).  Bergeron testified that they applied heat to the hatch covers with a propane torch, applied WD-40 and other lubricants, and continued "to work the mechanism back

2

and forth" until they were functional.  (Rec. Doc. 35-7 at 27).  This work was reflected in Total

Marine's invoice for the *Sea Rambler*, which included charges for "[r]e-work either (8) flush

deck hatches. Freeing tightening mechanism as requested by USCG."  The hatch covers were

then reinstalled on the *Sea Rambler*.

       On January 1, 2013, Bergeron decided to perform an air pressure test so that there would

be "[n]o surprises for the Coast Guard" on January 2, 2013, when the Coast Guard was scheduled

to re-test the repairs.  Bergeron testified that he, Aldana, and Doug Gautro were the only Total

Marine employees working on the *Sea Rambler* that day.  (Rec. Doc. 35-7 at 32).  Captain

Browne was also present.  Bergeron set up the air pressure equipment and was in charge of the

air pressure controls.  Prior to the introduction of air pressure, Aldana tightened the hatches with

a t-wrench.  Bergeron then introduced air pressure into the compartments.  When the pressure

reached 1.5 psi, air was found to be escaping from the center, stern hatch cover, which was

located over the lazarette tank.  Bergeron testified that he told Aldana "you might want to see if

you can tighten the hatch a little bit."  (Rec. Doc. 35-7 at 42).  At some point Captain Browne

tried to help Aldana tighten the hatch cover.  Captain Browne placed a pipe over the t-wrench

handle and slowly pulled the pipe towards himself.  This is sometimes referred to as a "cheater

pipe" or "cheater bar" because it provides more leverage and makes it easier to tighten the screw

or nut.  (Rec. Doc. 39-2 at 5).  Captain Browne testified that he pulled the pipe 2 to 4 inches

toward himself when he heard a "pop" and witnessed Aldana falling over the stern railing of the

vessel.  The hatch cover had blown off, striking Aldana in the face.  Aldana testified that he has

no recollection of Captain Browne performing this act.

       On March 1, 2013, Aldana filed the present lawsuit in the twenty fourth judicial district

court in Jefferson Parish.  (Rec. Doc. 1-2 at 1).  Aldana brought this lawsuit against Maybelle

Shipping, the operator of the *Sea Rambler*, and Catlin Insurance Co., Maybelle's indemnity insurer.  Aldana alleges that he sustained severe and permanently disabling injuries to his head, face, jaw, and eyes as a result of this accident.  Aldana claims that the injury was a result of improper maintenance by the owners and crew of the *Sea Rambler*, as well as negligent conduct and activities of the vessel's crew.  (Rec. Doc. 1-2 at 2).  Aldana is suing for damages under General Maritime Law and Section 905(b) of the Longshore and Harbor Workers Compensation Act.  Defendants removed the case to this Court on March 25, 2013.

On April 1, 2013, Defendants filed an Answer in which they denied all liability and asserted various affirmative defenses.  (Rec. Doc. 4).  Specifically, Defendants claim that Aldana was contributorily negligent.  Defendants also deny that there was a breach of any shipowner duty as set forth by the Supreme Court in *Scindia Steam Navigation Co., Ltd. v. De Los Santos*, 451 U.S. 156 (1981).

Separately, Maybelle and Siewdath Sookram filed a civil action, as owners of the *Sea Rambler*, seeking exoneration from and/or limitation of liability.  Petitioners claim that the *Sea Rambler* had a market value of $700,000.00 and no freight at the time of the accident.  This action was consolidated with the present case.  In response to the complaint for exoneration from or limitation of liability, the American Longshore Mutual Association, Ltd. filed an answer and claim ("ALMA").  (Rec. Docs. 13).  ALMA explains that it was the workers' compensation insurer of Roque Aldana's employer, Total Marine.  ALMA asserts that the accident was the result of the negligence or fault of the *Sea Rambler* and her crew and master.  According to ALMA, as a result of the accident it was forced to pay Aldana workers' compensation benefits pursuant to the LHWCA.  ALMA claims that it is entitled to indemnity and/or contribution and reimbursement of all compensation benefits paid to or on behalf of Aldana.  Additionally,

4

ALMA claims that it is entitled to a credit in the amount of any judgment in favor of Aldana against any future workers' compensation obligation.  (Rec. Doc. 13 at 7).

On September 26, 2013, the Court issued an Order granting Maybelle and Sookram's motion for entry of a default judgment against all non-claimants.  (Rec. Doc. 19).

II.    **PRESENT MOTION**

   A.    **Motion for Summary Judgment filed by Defendants Maybelle and Catlin Insurance and Petitioners-in-limitation, Maybelle and Sookram (Rec. Doc. 35)**

Defendants Maybelle and Catlin Insurance and Petitioners-in-limitation Maybelle and Sookram (collectively "Maybelle") ask this Court to grant summary judgment as to Aldana's claims brought under 33 U.S.C. § 905(b) and claims brought by ALMA for recoupment of medical and indemnity benefits paid under the LHWCA.  (Rec. Doc. 35).  According to Maybelle, there are no contested issues of fact and the Court should rule, as a matter of law, that Maybelle did not breach any of the third-party vessel duties, as set forth by the Supreme Court in *Scindia*.

First, Maybelle argues that the vessel was turned over to Total Marine in a condition whereby an experienced shipyard would have been able to carry out its repairs in a reasonably safe manner by the exercise of ordinary care.  Maybelle emphasizes that the hatch covers had been re-worked by Total Marine employees and that Bergeron, the Total Marine general manager, was satisfied with their condition.  Maybelle argues that a shipowner cannot be found negligent when a condition of the ship that needs repair work injures the person hired to perform those repairs.  (Rec. Doc. 35-1 at 23) (citing *Stass v. American Commercial Lines*, 720 F.2d 879, 882 (5th Cir. 1983)).  Further, Maybelle contends that any defect in the hatch covers was not hidden from Total Marine, as Bergeron inspected and approved each hatch cover before

5

performing the air-pressure test.  Maybelle relies on a recent case out of the Southern District of Texas in which the court granted summary judgment for the vessel owner in an almost identical factual scenario.  (Rec. Doc. 35-1 at 2) (citing *Velez v. Laredo Offshore Services*, No. G-09-241, 2010 WL 2757489 (S.D. Tex. July 13, 2010)).

Second, Maybelle argues that it did not maintain any active control over the vessel or its equipment and parts.  Maybelle claims that while the *Sea Rambler*'s Captain, Browne, was present on the day of the accident, he "was a mere observer who lent his friend, Aldana, a hand when he saw him struggling to tighten down the hatch cover."  (Rec. Doc. 35-1 at 27).  Maybelle argues that Browne had no control over the work or the methods used to perform the work. According to Maybelle, Browne did not provide instruction and instead did exactly what Aldana and Bergeron, "the experts," wanted him to do.  (Rec. Doc. 35-1 at 30).  Therefore, Maybelle argues that there was no breach of the "active control" or "active negligence" duty.

Third, Maybelle argues that Browne had no actual knowledge of any hazards and therefore no duty to intervene.

### B.     ALMA's Opposition (Rec. Doc. 39)

ALMA asks the Court to deny Maybelle's motion for summary judgment because, according to ALMA, numerous material facts remain at issue.  ALMA claims that Captain Browne was present at the Total Marine shipyard for 60 to 70 percent of the time that repairs were being performed.  (Rec. Doc. 39 at 2); *cf.* (Rec. Doc. 35-2 at 1; Maybelle's Statement of Uncontested Material Facts ("Browne was present at Total Marine during the repair process, he observed the repairs' progress for 'half an hour or an hour' a day, and some days not at all.")).  ALMA emphasizes that Captain Browne was present in the tool room when the hatch covers were being worked on.  (Rec. Doc. 39 at 3).  ALMA claims that Browne acted on his own

6

initiative, without a request from Aldana or Bergeron, when he picked up the cheater pipe and put additional pressure on the bolt. (Rec. Doc. 39 at 4). ALMA claims that Browne applied too much force, causing the strongback mechanism to break. ALMA characterizes Captain Browne's actions as happening "so quickly, in fact, that Plaintiff did not even have time to register that Captain Browne had inserted the cheater pipe . . . ." (Rec. Doc. 39 at 4). ALMA argues that the extent of Captain Browne's involvement in the repairs as well as his knowledge regarding over-torqueing a hatch cover and Aldana's knowledge regarding the incident and the risk of harm present questions of fact that preclude summary judgment.

ALMA also argues that Maybelle breached its duty of active control owed to the Plaintiff under *Scindia*. ALMA claims that Captain Browne actively intervened in the repair operations and substantially interfered with the repair workers' exercise of exclusive control, thereby breaching the active control duty and negligently causing Plaintiff's injuries. (Rec. Doc. 39 at 7). ALMA argues that Captain Browne's active control is evident by his constant presence during the repair work as well as his unilateral decision to pull the cheater pipe. ALMA argues that not only did his conduct trigger the active control duty, but his conduct also negligently caused Aldana's injuries. ALMA argues that Captain Browne should have known about the potential risks involved in working on the hatch covers while the compartments were still pressurized.

C.      **Aldana's Opposition (Rec. Doc. 40)**

Aldana formally adopts ALMA's argument regarding Captain Browne's active control and negligence. Aldana further argues that Maybelle is liable because it breached its turnover duty as described in *Scindia*. (Rec. Doc. 40 at 2). Aldana argues that Maybelle failed to turn over the vessel to Total Marine in a reasonably safe condition and failed to warn Total Marine and Aldana of the hidden defects in the vessel hatches. Aldana acknowledges that when a vessel

7

is turned over for repairs, the vessel owner cannot be liable for an injury caused by the hazard that the repairs were intended to remedy.  However, Aldana claims that the *Sea Rambler* was turned over to Total Marine for the single purpose of allowing the U.S. Coast Guard to inspect the wear plate.  Aldana argues that all of the additional work done beyond this purpose was subject to Maybelle's turnover duty.  Aldana emphasizes that the hatch covers had not been previously tightened by Maybelle and the hatch cover involved in the accident had an indent in the surface which prevented it from sealing.  (Rec. Doc. 40 at 5).  Further, Aldana claims that Maybelle failed to lubricate the strongback bolts, which is explicitly required by the manufacturer's warning on the hatch cover.  (Rec. Doc. 40 at 6).  Aldana also argues that Maybelle had a duty to warn Total Marine about the un-lubricated hatch covers.

> **D.**     **Defendants' Reply (Rec. Doc. 41)**

Maybelle submits a brief reply in which it claims that ALMA takes deposition testimony out of context in order to present a material fact to this Court.  Maybelle reiterates that under the "turnover duty" the hatch covers were within the scope of the repairs that Total Marine was hired to perform.  Maybelle emphasizes that Total Marine's invoice included charges for "re-working" the hatch covers as requested by the Coast Guard.  (Rec. Doc. 41 at 7).  Maybelle also argues, with respect to control, that Browne did not supervise the Total Marine employees or instruct them on how to perform their jobs.  Instead, Maybelle claims, Captain Browne merely lent a hand.

## III.     LAW AND ANALYSIS

> **A.**     **Standard of Review**

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as

to any material fact and that the moving party is entitled to a judgment as a matter of law."
*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)).  When
considering a motion for summary judgment, the district court "will review the facts drawing all
inferences most favorable to the party opposing the motion."  *Reid v. State Farm Mut. Auto. Ins.*
*Co.*, 784 F.2d 577, 578 (5th Cir. 1986).  If the party moving for summary judgment demonstrates
the absence of a genuine issue of material fact, "the nonmovant must go beyond the pleadings
and designate specific facts showing that there is a genuine issue for trial."  *Willis v. Roche*
*Biomedical Labs, Inc.*, 61 F.3d 313, 315 (5th Cir. 1995).  "A dispute about a material fact is
genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving
party."  *Id.*  If the record taken as a whole could not lead a rational trier of fact to find for the
nonmoving party, no genuine issue exists for trial.  *See Matsushita Elec. Indus. Co. v. Zenith*
*Radio*, 475 U.S. 574, 688 (1986).

**B.      Section 905(b)**

Aldana has asserted a third-party vessel negligence claim against Maybelle under §
905(b) of the Longshore and Harbor Workers' Compensation Act.  Section 905(b) of the
LHWCA gives a longshore worker the right to file a third-party suit against a shipowner for
personal injuries sustained aboard the owner's vessel, if he or she is injured due to the negligence
of that vessel.  3 U.S.C. § 905(b).  From its inception, the § 905(b) negligence remedy proved
difficult to define.  In *Scindia Steam Navigation Company v. De Los Santos*, the Supreme Court
defined the scope of a vessel owner's duty under § 905(b) and outlined three duties that
shipowners owe to longshoreman.  451 U.S. 156 (1981).  These duties include: (1) the "turnover
duty," relating to the condition of the ship upon the commencement of stevedoring operations;
(2) the duty to prevent injuries to longshoremen in areas remaining under the "active control" of

the vessel; and (3) the "duty to intervene."  *Id.*  The first and second of these duties are at issue in the present case.  The Court will discuss each in turn.

### 1.    *Turnover Duty*

Explaining the turnover duty in more detail, the Court of Appeals for the Fifth Circuit stated:

> . . . the shipowner must at least exercise "ordinary care under the circumstances to have the ship and its equipment in such condition that an expert and experienced stevedore will be able by the exercise of reasonable care to carry on its cargo operations with reasonable safety."  The shipowner may rely on the stevedore to perform its work with reasonable care, but must warn the stevedore of "any hazards on the ship or with respect to its equipment that are known to the vessel or should be known to it in the exercise of reasonable care, that would likely be encountered by the stevedore in the course of his cargo operations and that are not known to the stevedore and would not be obvious to or anticipated by him if reasonably competent in the performance of his work."

*Stass v. American Commercial Lines, Inc.*, 720 F.2d 879, 882 (5th Cir. 1983) (citing *Scindia*, 451 U.S. at 166-67).  This duty is subtly altered in the repair operations context.  *See Stass*, 720 F.2d at 882.  "The courts have long recognized that the vessel owner has no duty to deliver his ship to the shipyard in a hazard-free condition, when the requested repairs would remedy the hazards which cause the injury."  *Id.* (citing *West v. United States*, 361 U.S. 118 (1959)).  "[A] ship may not be found negligent merely because a condition of the ship that requires repair or inspection injures the person hired to inspect or repair that condition."  *Id.* (quoting *Hill v. Texaco, Inc.*, 674 F.2d 447 (5th Cir. 1982)).

In *Stass*, the Fifth Circuit found that the vessel owner was not liable for the plaintiff's injuries, which were caused when the plaintiff slipped on soy beans on a barge and fell 14 to 16 feet, sustaining serious injuries.  The plaintiff in *Stass* was a shipfitter for the Louisiana Dock

Company and repaired barges for a living.  *See* 720 F.2d at 881.  The barge had been turned over to Louisiana Dock for repairs on the hull and several grain doors.  *Id.*  The Fifth Circuit emphasized the fact that it was a matter of routine procedure for Louisiana Dock to clean barges before it performed the requested repairs.  *Id.* at 883.  In fact, in this case, Louisiana Dock had cleaned part of the barge in question and recorded this in its work records.  However, Louisiana Dock did not clean the area where the plaintiff slipped.  *Id.* at 884.  The Fifth Circuit explained that "cleaning the areas to be repaired on incoming barges was . . . simply 'a necessary first step in doing the work,' and the slippery footing caused by the sprouts was a risk 'inherent in the carrying out of the contract' for repairs . . . ."  *Id.* at 884.

The court in *Stass* relied heavily on its previous decision in *Duplantis, et al. v. Zigler Shipyards, Inc.*, 692 F.2d 372  (5th Cir. 1982).  In *Duplantis*, a tragic explosion took place aboard a tank barge killing three employees of Zigler Shipyards.  The Fifth Circuit affirmed the district court's grant of summary judgment, finding that the vessel owner had not violated any duty of care imposed under § 905(b).  The barge had been delivered to Zigler Shipyards for repair of a leak.  *Id.* at 373.  The Zigler workers performed gas-freeing operations before attempting to weld the hole.  However, gas was still present when the employees began to weld, causing an explosion.  *Id.*  The court found that Zigler Shipyards was experienced in gas-freeing and that "[a]lthough gas-freeing the barge was not the only function that Zigler was to perform, this work was critical to its ability to repair the pinhole."  *Id.* at 375.  It was a necessary "first step in doing the work Zigler had undertaken."  *Id.*

In the present case, the *Sea Rambler* was turned over to Total Marine in response to the U.S. Coast Guard's request, so that the wear plate on the stern hull could be inspected and potentially repaired.  Total Marine specialized in the repair of oil-field related vessels and these

11

repairs were typical of the type of repairs performed by Total Marine.  (Rec. Doc. 39-1 at 3).  As part of the U.S. Coast Guard's inspection, it required that an air-pressure test be performed so that it could inspect the water tight integrity of the stern hull.  (Rec. Doc. 39-1 at 7).  This type of testing was common at Total Marine for any repairs performed.  (Rec. Doc. 39-1 at 7).  During this testing, the Coast Guard decided that it could not be satisfied with the accuracy of the air pressure test because the hatch covers were frozen.  (Rec. Doc. 35-7 at 24).  Total Marine's general manager then directed that the hatch covers be removed and brought into the tool room so that they could be "re-worked." Total Marine's invoice reflected this work, as it charged $475 for "[r]e-work eight 980 deck hatches. Freeing tightening mechanism as requested by USGC." (Rec. Doc. 35-10 at 1).  After freeing the mechanisms, Total Marine replaced the hatch covers and proceeded to tighten them in order to perform an air pressure test.  It was during this testing that Aldana was injured.  The Court finds that this testing was part of the job that Total Marine was hired to perform and the risk involved in tightening the hatch covers and air pressure testing was inherent in the carrying out of this job.

Aldana contends that because the *Sea Rambler* was turned over to Total Marine for "one single purpose of placing the vessel on dry dock to provide the U.S. Coast Guard with a means of inspecting the wear plate at the stern of the vessel," the work that Total Marine ultimately performed on the hatch covers is not covered by the repair exception to the turnover duty. Aldana argues that Maybelle breached its turnover duty when it turned over the vessel to Total Marine with ungreased strongback bolts.  The Court disagrees.  Captain Browne testified that the *Sea Rambler* was turned over to Total Marine because the U.S. Coast Guard wanted to make sure that the welding technique used to secure the wheel plate to the hull of the vessel "didn't compromise the airtight integrity of the vessel."  (Rec. Doc. 35-5 at 6).  Stated very generally, as

12

Aldana does, the *Sea Rambler* was originally tendered to Total Marine so that the stern of the vessel could be inspected and repaired, if necessary.  This inspection required an air pressure test and re-working and tightening the hatch covers was a necessary step in performing the air pressure test.  Accordingly, like in *Stass* and *Duplantis*, the risk associated with the testing and tightening of the hatch covers was inherent in the carrying out of the contract by Total Marine.  Thus their turnover duty was not breached.  There is no question of material fact

### 2.    *Active Control*

The Supreme Court, in *Scindia*, explained that "the vessel may be liable if it actively involves itself in the cargo operations and negligently injures a longshoreman or if it fails to exercise due care to avoid exposing longshoremen to harm from hazards they may encounter in areas, or from equipment, under the active control of the vessel during the stevedoring operation."  451 U.S. at 166; *see also Daniel v. Ergon, Inc.*, 892 F.2d 403, 410 (5th Cir. 1990) ("the vessel may be liable if it *actively involves* itself in the . . . operations and negligently [causes harm]").  As this Court explained in *Bourda v. Seacor Marine, Inc.*,

> The "active control" duty "recognizes that although a vessel owner no longer retains the primary responsibility for safety in a work area turned over to an independent contractor, no such cession results as relates to . . . equipment over which the vessel's crew retains operational control."  On the contrary, the shipowner owes a duty to "exercise due care to avoid exposing longshoremen to harm from hazards they may encounter . . . from [such] equipment.  This duty to exercise due care likewise applies whenever the vessel crew actively "participates in the cargo [or, in this case, repair] operations."

No. 00-2459, 2002 WL 10458, at *1 (E.D. La. Jan. 2, 2002) (citations omitted).

In the present case, a genuine issue of material fact exists as to whether Maybelle breached its "active control" duty.  The parties agree that Captain Browne tried to help Aldana

tighten the hatch cover by placing a "cheater pipe" over the t-wrench handle and pulling it toward himself.  This technique creates more leverage and thus made it easier to tighten the screw or nut.  When he did this, he became an active participant in the repair work.  In that instant, he essentially took over control of the job, or at least the specific part of the job that he set out to perform.  There is no evidence in the record that Aldana or Bergeron asked him to assist with the cheater pipe.  (*See* Rec. Docs. 39-4 at 7; 39-2 at 10).  It may be the case that the use of a cheater pipe is standard in this situation.  In fact, Aldana testified that he and Captain Browne used a cheater pipe to loosen the bolts the day before the incident   However, the question in this case is whether Captain Browne was the proper person to use the pipe.  As Bergeron and Aldana both testified, the safety of the tightening technique depends on the degree of tightening.  Bergeron testified that there is no implicit danger in slightly tightening a hatch cover that is under pressure.  However, he indicated that "over tighten[ing]" it could result in safety issues.  (Rec. Doc. 35-7 at 17).  Bergeron further explained that only the person doing the tightening can tell how much to tighten.  (Rec. Doc. 35-7 at 44).  Similarly, Aldana testified that if he had asked Captain Browne to help him tighten the bolt, he would have told him how much to tighten.  (Rec. Doc. 39-4 at 10).  Aldana explained that this is because he knew the size of the bolt and he knew how much torque a C bolt can handle.  (Rec. Doc. 39-4 at 10).  Unlike Aldana, who had participated in air-pressure testing 6 to 12 times while at Total Marine (Rec. Doc. 35-9), Captain Browne testified that he had never assisted in air testing a vessel before.  (Rec. Doc. 39-2 at 10).  He did not know how much torque the C bolt in question could handle.  Yet he nevertheless attempted to tighten it.

Considering the evidence in the light most favorable to the non-moving parties, the Court finds that a reasonable juror could determine that Captain Browne was negligent when he

14

assisted Aldana with a cheater pipe without being instructed to do so and without proper experience in this field.  Further, a jury could find that his negligence resulted in the over-tightening of the hatch cover and, in turn, caused Aldana's injuries.  For this reason, summary judgment is inappropriate at this time.

**IV.     CONCLUSION**

For the foregoing reasons,

**IT IS ORDERED** that Defendant's motion for summary judgment, (Rec. Doc. 35), is hereby **DENIED.**

New Orleans, Louisiana, this 21st day of July, 2014.

UNITED STATES DISTRICT JUDGE